IN THE SUPREME COURT OF NORTH CAROLINA

No.430A19

Filed 18 December 2020

IN THE MATTER OF: J.J.H., K.L.R., J.J.H., S.S.S., J.M.S.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 23 September 2019 by Judge William B. Davis in District Court, Guilford County. This matter was calendared for argument in the Supreme Court on 23 November 2020, but was determined on the records and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Mercedes O. Chut for petitioner-appellee Guilford County Department of Health and Human Services.*

*Battle, Winslow, Scott & Wiley, P.A., by M. Greg Crumpler, for appellee Guardian ad Litem.*

*Anné C. Wright for respondent-appellant mother.*

ERVIN, Justice.

Respondent-mother Niesha W. appeals from the trial court's order terminating her parental rights in the minor children, J.J.H.,[1] K.L.R., J.J.H., S.S.S. (Stacy), and J.M.S. After careful consideration of respondent-mother's challenges to the trial

---

[1] J.J.H., K.L.R., J.J.H., S.S.S., and J.M.S. will be referred to throughout the remainder of this opinion, respectively, as "James," "Kim," "Jake," "Stacy," and "Joshua," which are pseudonyms used to protect the identities of the juveniles and for ease of reading.

court's termination order[2] in light of the record and the applicable law, we conclude that the challenged termination order should be affirmed.

## I. Factual Background

On 4 April 2016, Guilford County Department of Health and Human Services filed juvenile petitions alleging that James, Jake, and Stacy were neglected and dependent juveniles and that Kim and Joshua were neglected juveniles and obtained the entry of orders placing the children into the nonsecure custody of DHHS. In its petitions, DHHS alleged that the agency had an extensive child protective services history with the family, having received eleven reports relating to the family between 8 October 2011 and 4 February 2016, nine of which had been substantiated. The reports that DHHS had received described instances of inadequate supervision, including (1) an incident in which two-year-old Stacy had been taken to the hospital on two different occasions as the result of burns to her buttocks, hands, and arms; (2) an incident in which five-year-old Joshua had hit and kicked four teachers at his daycare facility, resulting in his suspension; (3) an incident in which the children were left in the care of their maternal grandmother, who suffered from seizures and called a social worker to report that respondent-mother made a practice of dropping the children off at her house without permission even though the maternal

---

[2] The trial court terminated the parental rights of the fathers of the children in the challenged termination order as well. However, given that none of the children's fathers have sought relief from the trial court's termination order before this Court, we will refrain from discussing the proceedings relating to any of the children's fathers in this opinion.

grandmother could not care for them; (4) an incident in which the children were found alone at the home, with respondent-mother having explained that she had directed five-year-old Joshua to watch over the other children in her absence; (5) incidents in which Joshua had drawn pictures at school depicting sexual acts and explaining the human anatomy to his classmates, described sexual abuse by his older cousin who served as the children's nighttime babysitter, and attempted to engage in sexually inappropriate conduct with his younger siblings; (6) the fact that, even though James suffered from a birth defect that caused a large mass to grow in his nose, respondent-mother had missed five different medical appointments relating to his treatment for that condition; (7) an incident in which the children had to be returned to school because respondent-mother was not at home when they got off the bus; and (8) an incident in which the utilities had been turned off in the home. Although DHHS had offered to provide in-home services to the family as a result of these incidents, respondent-mother had been resistant to these offers and had only participated in the proffered services on a sporadic basis.

The juvenile petitions further alleged that DHHS had received yet another child protective services report on 28 March 2016 which described an incident of domestic violence that had occurred between respondent-mother and the father of James and Jake. According to respondent-mother, the father had assaulted her when he came to pick up Jake; however, the investigating officers saw no evidence that any such assault had occurred. The father, on the other hand, claimed that respondent-

mother had attempted to run over him with her automobile while he was holding Jake. In the aftermath of this incident, respondent-mother had been arrested and charged with assault with a deadly weapon. In the course of the ensuing DHHS investigation, Joshua reported that he had witnessed physical altercations between respondent-mother and James' and Jake's father and that he had been aware of drug use and inappropriate sexual behavior in the family.

As a result of these allegations, DHHS held a team decision meeting on 4 April 2016, in which respondent-mother had participated. According to the allegations contained in the juvenile petitions, respondent-mother had become upset during the meeting, at which point she "stood up and violently jerked [James], who suffers from a brain tumor, seizures, and a facial tumor, from his caregiver." Upon being told by a social worker not to leave with James, respondent-mother pushed and struck the social worker while holding James, resulting in intervention by agency security personnel. Although respondent-mother left the building with James, she subsequently reentered the building, handed James to another person, and, in an aggressive and threatening manner, approached the social worker, who was located behind the reception desk, resulting in a situation in which the social worker had to use her feet to fend off respondent-mother's assault and as the result of which respondent-mother was charged with "Simple Assault and Battery/Affray." At the conclusion of the team meeting, DHHS decided to seek nonsecure custody of the children.

The juvenile petitions came on for an adjudication hearing on 29 September 2016 and a dispositional and permanency planning hearing on 13 October 2016. On 10 November 2016, Judge Lawrence McSwain entered an order finding the children to be neglected and dependent juveniles as alleged in the DHHS petitions. On 28 November 2016, Judge Randle Jones entered a disposition and permanency planning order finding that respondent mother had entered into a services agreement, or case plan, with DHHS on 27 April 2016 that included components relating to "employment/income management," "housing/environmental/basic physical needs," "parenting skills," "mental health," "substance abuse," "family relationships/domestic violence[,]" and "visitation/child support/other[.]" In addition, Judge Jones found that respondent-mother had begun to comply with the provisions of her case plan and that she had attended weekly supervised visitation with the children since 2 September 2016. Judge Jones determined that it was in the children's best interests to remain in DHHS custody and ordered that they do so. In addition, Judge Jones established a permanent plan of reunification with a concurrent plan of adoption; allowed respondent-mother to have supervised visitation with the children for one hour per week, with DHHS having the authority to increase the frequency or duration of these supervised visits; and ordered respondent mother to comply with the provisions of her case plan and to submit to random drug tests.

After a permanency planning hearing that began on 9 November 2017, continued on 7 December 2017, and concluded on 1 February 2018, Judge Tonia

Cutchin entered an order finding that respondent-mother's behavior had not changed even though she had complied with some aspects of her case plan and that the concerns that had brought the children into DHHS custody remained in existence. Judge Cutchin found that efforts to reunify the children with respondent-mother would not be successful, that it would not be possible to return the children to respondent-mother's care within the next six months, that it would be in the children's best interests that termination of their parents' parental rights be pursued, and that adoption would benefit the children. As a result, Judge Cutchin changed the permanent plan for the children to one of adoption with a secondary concurrent plan of reunification and ordered DHHS to pursue termination of parental rights.

On 16 August 2018, DHHS filed a petition seeking to have respondent-mother's parental rights in the children terminated on the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and willful failure to make reasonable progress toward correcting the conditions that had led to the children's removal from the family home, N.C.G.S. § 7B-1111(a)(2). The DHHS termination petition was heard before the trial court on 10 and 11 June 2019 and 8 and 10 July 2019. On 23 September 2019, the trial court entered an order terminating respondent-mother's parental rights in the children. In its termination order, the trial court concluded that respondent-mother's parental rights were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1) and that the termination of respondent-mother's parental rights would be

in the children's best interests. Respondent-mother noted an appeal to this Court from the trial court's termination order.

## II. Substantive Legal Analysis

In seeking relief from the trial court's termination order before this Court, respondent-mother argues that the trial court erred by concluding that her parental rights were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and that the termination of her parental rights would be in the children's best interests. According to well-established North Carolina law, the termination of a parent's parental rights in a child involves the use of a two-step process that consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110; (2019); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). The petitioner bears the burden at the adjudicatory stage of proving the existence of one or more of the grounds for termination set out in N.C.G.S. § 7B-1111(a) by "clear, cogent, and convincing evidence." N.C.G.S. § 7B-1109(e), (f) (2019). In the event that the trial court finds that the parent's parental rights are subject to termination pursuant N.C.G.S. § 7B-1111(a), it must proceed to the dispositional stage, at which it must "determine whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019).

## A. Grounds for Termination

As an initial matter, respondent-mother argues that the trial court erred by finding that her parental rights in the children were subject to termination. "We

review a trial court's adjudication under N.C.G.S. § 7B-1109 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusion of law.' " *In re J.A.E.W.*, 375 N.C. 112, 116, 846 S.E.2d 268, 271 (2020) (quoting *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019) (citing *In re Moore*, 306 N.C. 394, 403–04, 293 S.E.2d 127, 132 (1982)). "Unchallenged findings of fact made at the adjudicatory stage are binding on appeal." *In re Z.V.A.*, 373 N.C. 207, 211, 835 S.E.2d 425, 429 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)). "The issue of whether a trial court's findings of fact support its conclusions of law is reviewed de novo." *In re J.S.*, 374 N.C. 811, 814, 845 S.E.2d 66, 71 (2020).

According to N.C.G.S. § 7B-1111(a)(1), a trial court may terminate the parental rights of a parent if the trial court determines that the parent has neglected the child. N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile is defined, in pertinent part, as one "whose parent . . . does not provide proper care, supervision, or discipline; . . . or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare[.]" N.C.G.S. § 7B-101(15).

> Generally, "[t]ermination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing." *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016) (citing *In re Ballard*, 311 N.C. 708, 713–15, 319 S.E.2d 227, 231–32 (1984)). However, "if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *Id.* at 843, 788 S.E.2d at 167. When determining whether future neglect is likely, "the trial court must consider all evidence of relevant circumstances or events which existed or occurred *either before or after* the prior adjudication of neglect." *In re Ballard*, 311 N.C. at 716, 319 S.E.2d at 232–33. "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding*." *Id.* at 715, 319 S.E.2d at 232.

*In re J.O.D.*, 374 N.C. 797, 801–02, 844 S.E.2d 570, 575 (2020).[3]

In the challenged termination order, the trial court found that the children had previously been adjudicated to be neglected juveniles on 29 September 2016. In addition, the trial court made extensive evidentiary findings that detailed the extent to which respondent-mother had made progress complying with the components of her case plan relating to "employment/income," "housing," "substance abuse," "parenting skills," "mental health," "family relationships/domestic violence," and "visitation/child support/other." After determining that respondent-mother had

---

[3] As we have noted in our recent opinion in *In re R.L.D.*, No. 122A20, slip op. at 5 & n.3 (N.C. Dec. 11, 2020), a showing of past neglect and a probability of future neglect is not necessary to support a determination that a parent's parental rights in a juvenile are subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1) in light of the fact that such a determination is also permissible in the event that there is a showing of current neglect.

made progress toward complying with the relevant provisions of her case plan, the

trial court found that:

> On the whole, the evidence reports, observations, exhibits and testimony are that while [respondent-mother] has made substantial progress in activities on her case plan, and while she dearly loves her children, she lacks substantial capacity to meet the needs of the children, has inadequate plans for the future and has not demonstrated an ability to plan for obstacles.

As a result, the trial court concluded that respondent-mother's parental rights in the

children were subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1)

because:

> 29. Grounds have been proven to terminate the parental rights of [respondent-mother] . . . given that [she] . . . neglected the juveniles, the neglect continues to date, and there is a likelihood of the repetition of neglect if the juveniles were returned to [her], as follows:
>
> a. Past neglect of the juveniles was proven by clear cogent and convincing evidence at the [a]djudication in the juveniles' respective underlying cases.
>
> b. The current ongoing neglect by [respondent-mother] is evidenced by the fact that she has been resistant towards utilizing psychological services; she has refused to submit to random drug screens for long periods of time, which has impeded the monitoring of compliance; she has exhibited improper responses to stressful situations despite completion of anger management counseling; and has not proven the ability to care for herself and the children financially despite her employment.

[She] has made substantial strides and efforts towards complying with her case plan and there is no doubt that she dearly loves the juveniles, and would like to be reunited with them. Her lack of substantial capacity for analysis and forecasting problems and problem-solving issues as they arise, and planning for future circumstances presents substantial obstacles to her ability to provide appropriate care to the juveniles, and makes the likelihood of repetition of neglect high. Given [her] limitation to do these things, the substantial struggles, obstacles and needs of the juveniles, limited housing and transportation capacity of [her], if the juveniles were to return to her care there is a substantial likelihood of repetition of neglect, and the juveniles would not receive appropriate levels of care and supervision.

. . . .

e. Given that many of the conditions which led to removal still exist, there is a likelihood of repetition of neglect by [respondent-mother] in that [she has] failed and continue[s] to fail to comply with the components of [her] respective case plan[ ] to address the conditions that led to the removal of [her] children.

Although respondent-mother concedes that the children had previously been found to be neglected juveniles, she argues that the trial court's ultimate findings that there was current ongoing neglect and a likelihood of repetition of neglect were not supported by the record evidence and the trial court's evidentiary findings,

particularly given that, in her view, a number of the trial court's evidentiary and ultimate findings lacked sufficient record support.

### 1. Sufficiency of the Evidentiary Support for the Trial Court's Findings of Fact

### a. Employment/Income

In its order, the trial court found that respondent-mother "ha[d] not proven the ability to care for herself and the children financially despite her employment." According to respondent-mother, the trial court erred by depicting her financial situation in this manner given its statement in Finding of Fact No. 18 that, "[a]t this time, [she] has sufficient income to provide for herself and the juveniles." We do not find respondent-mother's contention to this effect to be persuasive.

Finding of Fact No. 18 states that

> [o]n or about December 2017 and while working at Wendy's, [respondent-mother] completed a budget. The budget included rent of $495.00 per month, utilities, water, groceries, household supplies, gas, insurance, and her child support obligation of $126.00 per month. Her rent and other expenses have stayed the same. However, the budget did not list any medical expenses for herself or the juveniles, cost for clothing and shoes, or any potential child care/school cost, such as school supplies. At this time, [respondent-mother] has sufficient income to provide for herself and the juveniles. The budget presented appears to reflect an incomplete accounting of her own personal expenses for the month of December 2017, with no allowance for additional expenses that might be incurred if the juveniles came to reside with her. However, that budget reflects a monthly surplus of $471.80, an income in excess of her expenses that would potentially be applied to additional expenses if the juveniles were to come live with

> her, and her current employment provides an even greater
> income.

As we read the language of the relevant finding, the trial court found that respondent-mother's budgeting skills contained certain deficiencies and made reference to the potential expenses that might be associated with the larger residence that the trial court determined elsewhere in the termination order that respondent-mother would need. As a result, when taken in context, we are satisfied that the trial court's findings reflect, without directly stating, a nuanced determination that, while respondent-mother's financial situation had improved in light of her ability to obtain higher-paying employment and even though she appeared to have sufficient financial resources in light of current conditions, the trial court continued to harbor reservations about respondent-mother's ability to satisfy her own financial needs and those of all five children, particularly given that her budgeting skills appeared to be deficient, that a number of the children had special needs and that, as is discussed in more detail below, respondent-mother's current living quarters were inadequate to house the entire family safely. As a result, we are not persuaded that the trial court's determination that respondent-mother had "not proven the ability to care for herself and the children financially" should be disregarded in determining whether a repetition of neglect was likely to occur if the children were returned to respondent-mother's care.

### b. Housing

Next, respondent-mother argues that the trial court's findings relating to the issue of housing do not support a conclusion that the children would probably experience a repetition of neglect given that she has maintained stable housing for almost two years and she has the financial capacity to pay for a larger home. According to Finding of Fact. No. 18, respondent-mother's

> home is fully furnished and has two bedrooms and one bathroom. Initially, [respondent-mother] reported the children would sleep in one bedroom that has two sets of twin bunk beds and a single twin bed . . . . She also indicated that she would place a partition between the juveniles to separate the boys and the girls. . . . [Respondent-mother] was made aware . . . that her current housing plan was not appropriate, in light of the sexualized behaviors of [Joshua], and that [Joshua] needed his own room. [Respondent-mother] revised her plan and stated that she would be willing to give up her room to allow [Joshua] to have his own room and she will sleep in the living room. Between that time and now, [respondent-mother] is taking steps to find more appropriate housing, but has been unable to find housing that is more appropriate for the juveniles, while also being affordable within her budget. . . . Given the variety of challenges that the various juveniles face, even a revised living plan within the current residence will not provide for sufficient space and opportunities for the juveniles in the home.

In addition, the trial court found that respondent-mother had taken steps to find more appropriate housing without actually locating a suitable residence that could be procured consistently with her existing budgetary constraints, noting that "subsidized housing programs would not approve her for a residence that would be scaled based on all the juveniles, unless or until they had a date as to when the

juveniles will be living with her." In our view, since the trial court's evidentiary findings of fact clearly show that respondent-mother had not been able to identify, much less obtain, housing that would be adequate to safely accommodate both respondent-mother and the children as of the conclusion of the termination hearing despite the fact that she was on notice that her existing residence was deemed inadequate,[4] the challenged portion of the trial court's housing-related finding of fact has ample record support despite the fact that she might have sufficient financial resources to rent an adequate residence upon locating one.

In seeking to persuade us to reach a contrary conclusion, respondent-mother argues, in reliance upon the decision of the Court of Appeals in *In re A.G.M.,* 241 N.C. App. 426, 773 S.E.2d 123 (2015), that the trial court had erred by considering the suitability of her current housing situation in determining whether there was a likelihood of a repetition of neglect given (1) the fact that there was no reason to believe that the children would be allowed to live with her or have overnight visitation at her current resident in the immediate future and (2) the fact that she would be eligible for housing assistance that would permit her to obtain a larger home in the

---

[4] Admittedly, respondent-mother faces a dilemma arising from the fact that she cannot obtain additional housing assistance until a date upon which the children will begin living with her has been established and that she cannot obtain adequate housing in the absence of this increased amount of public housing assistance. However, since respondent-mother has apparently not been able to even locate a residence that she could obtain in the event that additional housing assistance became available to her, we do not believe that the dilemma discussed in this footnote provides any basis for concluding that the relevant finding lacks sufficient record support.

event that the children were returned to her care and the fact that she had already been able to obtain increased income through her employment. We do not find this argument persuasive.

In *In re A.G.M.*, the Court of Appeals reversed the trial court's determination that the respondent's parental rights were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1) on the grounds that the three-month period of time between the entry of the dispositional order in the underlying juvenile proceeding and the termination hearing was insufficient to permit the making of a reasonable determination that future neglect would be probable. *Id.* at 441, 773 S.E.2d at 134. In its opinion, the Court of Appeals added that:

> [w]hile we agree that [r]espondent's efficiency apartment at the time of the termination hearing would not be appropriate housing for the children if [r]espondent continued to share the apartment with a man, DSS has failed to demonstrate how [r]espondent's living conditions were inappropriate or harmful to the children while the children were living with their foster parents, without any contact with [r]espondent, and while [r]espondent was without any legitimate expectation that she would obtain overnight visitation rights, much less custody of the children, in the immediately foreseeable future.

*Id.* at 441–42, 773 S.E.2d at 134. Aside from the fact that the language upon which respondent-mother relies constitutes dicta and has "no effect as declaring the law," *State v. Scoggin*, 236 N.C. 1, 13, 72 S.E.2d 97, 105 (1952); *see, e.g., In re T.R.P.*, 360 N.C. 588, 597, 636 S.E.2d 787, 794 (2006), there was no indication that the respondent in *A.G.M.*, unlike respondent-mother, had ever intended to bring the children to live

with her in her existing residence. As a result, we conclude that respondent-mother's reliance upon *In re A.G.M.* is misplaced.

Finally, respondent-mother challenges the sufficiency of the record support for the trial court's housing-related findings concerning the dogs that are being kept at respondent-mother's residence. According to respondent-mother, the record does not support the trial court's findings that she owned "three" large dogs and that there were "several" 911 calls regarding the dogs. However, aside from the fact that certain reports that were admitted into evidence at the termination hearing make reference to the fact that three dogs were kept at respondent-mother's residence and that there had been multiple 911 calls concerning these animals, respondent-mother admitted at the termination hearing that she owned two dogs, one "little Jack Russell" and one "American Bully," and that law enforcement officers had been called to her home "more than one time" because the larger dog had broken loose from its chain and barked in an intimidating manner. In addition, a social work supervisor testified at the termination hearing that "two of the social workers who have been to the home have not even been able to get to the—the front door and had described the dog as being vicious." As a result, regardless of the number of intimidating dogs that actually occupied respondent-mother's home, the record clearly shows that there were safety-related concerns applicable to respondent-mother's residence given the apparently threatening nature of at least one of its canine residents. For that reason, we conclude that the trial court did not err by taking the concerns relating to

respondent-mother's dogs into account in evaluating the likelihood that the children would be subject to a repetition of their earlier neglect in the event that they were returned to respondent-mother's home. As a result, for all of these reasons, we hold that the trial court did not err in considering respondent-mother's housing situation in determining whether it was probable that the children would be neglected if they were returned to respondent-mother's care.

### c. Substance Abuse

The trial court found that respondent-mother had obtained a substance abuse assessment in May 2016 and had completed the recommended substance abuse treatment in September 2016, with that treatment having included both individual and group sessions. Since she completed treatment, respondent-mother had not tested positive for the presence of illegal drugs. Although the trial court found that respondent-mother had refused to participate in four drug screens between June and August 2017, it also found that respondent-mother's

> refusal to resume drug screens was not as a result of her resuming the use of illegal substances, but her frustration with [DHHS] and the [c]ourt. As a result, the [c]ourt d[id] not review them as a substantive violation of her case plan, in that they [were] not reflective of actual use of a controlled substance.

On the other hand, the trial court found that respondent-mother's refusal to participate in the drug screening process was "reflective of [her] incapability to respond effectively to frustration in difficult situation[s] and to persist in appropriate

behavior, despite those frustrations." In addition, the trial court found that respondent-mother had complied with all requests that she submit to drug screens after October 2017, when DHHS representatives explained to her that her participation in the drug screening process had been required as part of her case plan and that DHHS was not trying to catch her using drugs.

As a result of the fact that respondent-mother has not challenged the sufficiency of the record support for the evidentiary findings that the trial court made with respect to these substance abuse-related issues, those findings are binding upon us for purposes of appellate review. *See In re Z.V.A.*, 373 N.C. at 211, 835 S.E.2d at 429. Respondent-mother does, however, argue that the trial court erred by relying on substance abuse-related concerns in determining whether there was a likelihood of future neglect given the absence of any record support for the statement in Finding of Fact No. 29 that respondent-mother "ha[d] refused to submit to random drug screens for a long period of time, which has impeded the monitoring of compliance." After carefully reviewing the record, we agree with respondent-mother that the record evidence and the trial court's evidentiary findings do not support a determination that she refused to participate in the drug screening process for a "long period of time" or show that her temporary refusal to participate in the drug screening process had "impeded the monitoring of compliance." In addition, we note that a social worker acknowledged in her testimony that respondent-mother's substance abuse did not continue to be an issue at the time of the termination hearing. As a

result, we will disregard the challenged portion of the trial court's findings relating to the issue of substance abuse in determining whether a repetition of neglect was probable in the event that the children were returned to respondent-mother's care. *See In re J.M.*, 373 N.C. at 358, 838 S.E.2d at 177.

In addition, respondent-mother disputes the trial court's determination that her refusal to submit to drug screens was "reflective of [her] incapability to respond effectively to frustration in difficult situation[s] and to persist in appropriate behavior, despite those frustrations." According to respondent-mother, her compliance with the drug screening process after the purpose of that process had been explained to her demonstrates that she has the ability to deal with frustrating situations. However, the record evidence and the trial court's unchallenged evidentiary findings indicate that respondent-mother believed that "she had done enough for the [DHHS] and she would only do a drug screen if the [j]udge told her to do so." In our view, the fact that respondent-mother subsequently complied with requests that she submit to drug screening does not negate the fact that she expressed frustrations about the drug screening process in June, July, and August 2017. For that reason, we hold that the trial court did not err to the extent that it included respondent-mother's reactions to requests that she participate in the drug screening process in determining whether a repetition of the neglect that the children had previously experienced was likely in the event they were returned to respondent-mother's care.

### d. Parenting Skills

In addressing the extent of respondent-mother's parenting skills, the trial court found that respondent-mother had completed a parenting/psychological evaluation with Dr. Edward Morris on 1 September 2016 and that the recommendations that had been made as a result of that evaluation had been incorporated into her case plan. In addition, the trial court made findings of fact that reflected a number of Dr. Morris's opinions, including Dr. Morris's concern that, "[i]f the motivation or incentive isn't high enough to act in a certain way, she is not likely to give more than a cursory thought," a pattern which he found to be "potentially harmful and [which could] compromise the physical safety and emotional security of the children." In addition, the trial court pointed out Dr. Morris's statement that, on occasions when the children's medical, emotional, and educational needs were brought to respondent-mother's attention, she "either dismisses or minimizes them." Moreover, the trial court's findings reflect that respondent-mother struggles to manage her relationships with other people and note her tendency to deny or externalize problems, her poor judgment, her disregard for expectations, her resistance to changing her beliefs, and her lack of problem-solving skills. The trial court further found that respondent-mother had completed the Parenting Assessment Training Education program on 6 September 2016, that she had completed a second phase of the PATE program, and that she had "also completed the From Darkness to Light program to better understand [Joshua's] sexual acting

out and to recognize its origins and safety concerns." As a result of the fact that respondent-mother has not challenged the extent to which these findings have sufficient evidentiary support, they are binding for purposes of appellate review, *see In re Z.V.A.*, 373 N.C. at 211, 835 S.E.2d at 429, and are entitled to be considered in determining the risk that the children will be neglected in the future.

### e. Mental Health

Although respondent-mother has not challenged the sufficiency of the record support for the evidentiary component of the trial court's mental health-related findings, she does argue that the record evidence and the trial court's evidentiary findings do not support the trial court's ultimate finding that her "resistan[ce] towards utilizing psychological services" tended to show the existence of a risk of future neglect. In its termination order, the trial court found that DHHS had referred respondent-mother for a mental health assessment on 31 May 2016, that respondent-mother had completed a Comprehensive Clinical Assessment on 9 June 2016, and that the assessment had resulted in recommendations that she participate in individual mental health therapy and substance abuse-related group therapy. Respondent-mother began individual therapy on 6 July 2016 and "complied with therapy until she was discharged in May 2017."

A social worker testified at the termination hearing that, even though respondent-mother's therapist had discharged her in 2017, the therapist "could not say that [respondent-mother] was actually done with the therapy or had like

successfully completed it but that the mother stated on several occasions to the therapist that she had gotten all that she could out of therapy." Another social worker testified that, in spite of the fact that DHHS had attempted to discuss the importance of continued therapy with respondent-mother, "[respondent-mother] was not willing to be open to kind of discuss[ing] anything else with the therapist," that "the mother commented in the meeting [ ] that she didn't . . . need therapy anymore," and that respondent-mother "was just not open to receiving that at that time." The social worker supervisor testified that she brought up the topic of therapy with respondent-mother in a later meeting, at which point respondent-mother became "really upset" and "agitated" and "made the statement that unless the judge tells her to do it she does not care what DSS has to say."

According to a permanency planning order entered on 22 August 2018 that was admitted into evidence at the termination hearings, a therapist who worked with respondent-mother's eldest son had stated that "it [was] not in [Joshua's] best interest for [respondent-mother] to be included in his therapy sessions" given that Joshua feared respondent-mother and that respondent-mother "continued to minimize [his] need for therapy." Similarly, in a permanency planning order entered on 31 May 2019 that was also admitted at the termination hearing, the trial court found that, "[d]espite having completed Level I therapy and parenting classes, the mother has continued to minimize the reasons that the juveniles came into custody and even made comments regarding the juvenile(s) needing physical discipline

(including that [her eldest son] just needed a 'butt whooping')." As a result, in light of the trial court's evidentiary findings and the extensive record evidence concerning respondent-mother's attitude toward the therapy process, we hold that the trial court had ample justification for determining that respondent-mother "ha[d] been resistant" to utilizing therapy and mental health services, so that, in spite of her claim that she had done everything that she had been asked to do, there were legitimate grounds for questioning whether she had appropriately benefitted from the therapy that she had received.

### f. Family Relationships/Domestic Violence

The trial court found in Finding of Fact No. 18 that, even though respondent-mother "[was] in compliance in that she has attended the required programs and met the goals, the [c]ourt [remains] concerned that her anger still remains an issue at times." In its evidentiary findings, the trial court determined that respondent-mother had completed anger management counseling in September 2016 and a domestic violence victim's program in January 2017; that there were no known reports that she had been a victim or the perpetrator of violence since that time; that her "outlook and response ha[d] improved substantially"; that "[s]he ha[d] demonstrated increased maturity over the length of [the] case and responded to interventions"; and that, even so, "as recently as May 2019, [respondent-mother] became argumentative when the Social Worker praised one of the juveniles . . . for completing chores[,] [because she] did not believe the [s]ocial [w]orker's report."

Once again, respondent-mother has not challenged the trial court's evidentiary findings relating to family relationships and domestic violence as lacking in sufficient evidentiary support. Respondent-mother does, however, argue that the trial court erred by determining that her "improper responses to stressful situations despite completion of anger management counseling" provided evidence that future neglect was probable. More specifically, respondent-mother contends that the trial court's continued concern with her inappropriate responses to stressful situations rested solely upon a May 2019 incident in which she "became argumentative" in interacting with the social worker. Respondent-mother's argument with respect to this issue, when reduced to its essence, consists of an attempt to minimize the significance of this issue by asserting that her conduct during this incident was motivated by a concern for Joshua, directing our attention to her own testimony that Joshua had complained to her about the chores that he had been praised for completing, and asserting that her conduct on this occasion actually reflected an increased ability to empathize with her children. According to respondent-mother, this isolated incident does not reflect the existence of a risk of future neglect given the absence of any indication that it had an adverse impact upon the children.

Once again, we do not find respondent-mother's argument to be convincing. As we read the record, the trial court did not rely solely upon the May 2019 incident in determining that respondent-mother did not handle stressful incidents well, with this conclusion being evidenced by the fact that the trial court's reference to the event that

had occurred "as recently as May 2019" tends to suggest that the incident in question was only one of a number of incidents that revealed the existence of the underlying problem. This interpretation of the trial court's findings is bolstered by the social worker's testimony that respondent-mother would become loud and argumentative, on occasion, and that she had difficulty processing stressful subjects. In addition, the social worker explained that respondent-mother was able to handle situations more effectively when everything was going to suit her, but that she raised her voice, argued, and would not believe the things that she was told on other occasions—a description of respondent-mother's conduct that is consistent with that reflected in other portions of the record. In light of the manner in which respondent-mother tended to react to apparently stressful situations, the trial court had ample justification for expressing concern about the May 2019 incident. Finally, as we have already noted, the trial court found in other parts of the termination order that respondent-mother's refusal to submit to requested drug screens in 2017 reflected an inability to react in an appropriate manner when frustrated. As a result, the trial court's evidentiary findings and the record evidence amply support the trial court's ultimate finding that respondent-mother continued to have difficulty controlling her anger, with this problem having an obvious bearing upon the probability that the children would be neglected in the future given the likelihood that respondent-mother would inevitably have to deal with difficult situations in the event that the children were returned to her care.

### g. Visitation/Child Support/Other[5]

The trial court detailed respondent-mother's attendance at visitation with the children over the course of the proceedings and summarized her attendance as "good at times and not good at other times." According to the trial court, respondent-mother missed at least twenty-two of her scheduled visits with the children, a record that she attempted to explain in various ways, such as by stating that the visits had "slipped her mind" or that she had failed to confirm with DHHS in apt time. In addition, the trial court noted that, "on one occasion, when asked by the juveniles when they will come home, [respondent-mother] stated 'when they let you all,'" and found that respondent-mother's statement created "the concern that she values her and the juveniles' happiness in the present moment, but fails to recognize that in the long-term, she will need to provide them with appropriate care and discipline."

The trial court made additional findings relating to the visits that respondent-mother had with Joshua and the efforts that she made to understand his inappropriate sexual behavior. The trial court determined that, in addition to her completion of the From Darkness to Light program, respondent-mother had participated in therapeutic visits with Joshua from March to July 2017 and had "spoken with [Joshua] about his behaviors and has reviewed his behavior folder with

---

[5] We will refrain from addressing the trial court's findings relating to the issue of child support given that respondent-mother has not challenged those findings as lacking in sufficient record support and given that the trial court does not appear to have relied upon them in making its determination concerning the likelihood of future neglect.

him." On the other hand, the trial court found that respondent-mother "ha[d] a history of minimizing [Joshua's] inappropriate behavior, including statements like, '[h]e doesn't act that way around me'" and had "endorsed harsh physical punishments in response to [Joshua's] behavior, including, '[h]e just needs a butt whooping,'" while noting respondent-mother's testimony "that she no longer holds [the] position that physical punishment is appropriate" and stating that,

> due to her education throughout the process of this case, [respondent-mother] has learned additional tools for discipline, in that if the juveniles were to return home, she would tailor appropriate discipline to the specific needs of each juvenile, including using timeout, taking away toys, etc.[,] based on age and appropriate discipline for the juvenile involved.

In challenging the lawfulness of the trial court's findings concerning the statements that she made about the manner in which the children should be disciplined, respondent-mother argues that these statements constitute "historic information," did not reflect the nature of her thinking as of the time of the termination hearing, and do not tend to suggest that future neglect of the children would be probable. However, given the content of the trial court's finding concerning the nature of respondent-mother's current position with respect to the manner in which the children should be disciplined, we hold that the trial court's findings, taken in their entirety, adequately account for the changes that have occurred in respondent-mother's views and are not, for that reason, erroneous.

In addition, respondent-mother argues that the trial court erred by finding that respondent-mother's testimony that she did not want to make the children sad by imposing discipline upon them during visits creates a concern that she fails to recognize the need to provide adequate care and discipline for the children and that she is unable to appropriately address situations in which she is required to resolve problems. The concerns that the trial court expressed about respondent-mother's willingness to address disciplinary and other difficult situations are consistent with statements made by Dr. Morris, who found in his parenting/psychological evaluation that respondent-mother "denies or externalizes the problems, minimizes their severity, or tries to maintain the fantasy at the expense of reality." For that reason, we have no difficulty in concluding that this aspect of respondent-mother's challenge to the trial court's findings lacks merit, particularly given that, while respondent-mother may have developed improved insight concerning the manner in which discipline should be imposed, the record reflects the existence of an ongoing concern about the extent to which respondent-mother recognizes when the imposition of discipline is appropriate and when it is not.

The trial court also expressed concern that respondent-mother would be unable to manage the children's "complicated schedules, including appointments for doctors, therapy, medication, school, occupational therapy, speech therapy, tutoring[,] and IEP meetings." After noting that respondent-mother had experienced ongoing transportation difficulties, the trial court expressed concern about "whether she will

have the ability to transport the minor children to their medical and school appointments." In addition, the trial court noted that, even though respondent-mother had testified that she would rely upon the help of family and friends in order to manage the children's complex schedules, she had failed to identify these friends and family members "so that an evaluation [could] be made as to the ability of these individuals to meet the needs of the children."

Respondent-mother challenges the validity of the trial court's findings concerning her transportation-related issues and her ability to ensure that the children attended their medical and school appointments on a number of grounds. First, respondent-mother argues that the trial court's finding that the children have appointments for occupational therapy lacks sufficient evidentiary support. As DHHS agrees, the record does not contain any evidence tending to show that any of the children have occupational therapy appointments. On the other hand, the trial court's error in this respect has very little bearing upon the proper resolution of this case given that the remainder of the challenged finding, which states that "[t]he juveniles . . . have complicated schedules, including appointments for doctors, therapy, medication, school, . . . speech therapy, tutoring[,] and IEP meetings," has ample evidentiary support in light of the fact that each of the children suffers from various educational, medical, and psychological problems that require significant medication and therapeutic assistance.

As the record reflects, respondent-mother's eldest son Joshua has been diagnosed with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, Post-traumatic Stress Disorder, and behavioral problems; attends therapy twice a week; and takes five prescription medications. Among other things, Joshua has engaged in "property damage and acting out towards his siblings" and "a large amount of inappropriate sexualized behaviors" and "continues to steal, provoke[ ] fights with peers, break rules, talk[ ] to himself, [and] act[ ] out fighting with toys." After a psychological evaluation conducted in February of 2018, the examiner noted that Joshua had "disclosed a history of sexualized situations while living with his mother" and that his "inappropriate sexualized behaviors are reactive in nature to his past experiences." As a result, the psychologist recommended that Joshua "not be left alone unsupervised with children three or more years younger than him at any time," that "his access to the internet [should] be monitored closely in all settings," and that he should have his own bedroom.

Although the needs of the other children are less substantial than those of Joshua, each of them faces challenges of his or her own. Stacy has been diagnosed with Attention Deficit Hyperactivity Disorder and Adjustment Disorder with Disturbance of Conduct, attends therapy twice a week, and takes two prescription medications. Jake formerly attended weekly play therapy to address his behavioral problems, but those sessions were discontinued in 2018. As of the time of the termination hearing, Jake was scheduled to begin monthly individual therapy. Kim

receives speech therapy twice each week. James was born with a birth defect that created pressure within his nasal passage, causing the development of a mass in his nose that affected his brain, and experienced a brain tumor and seizures during his infancy. In spite of the fact that James received corrective surgery for his birth defect in 2016, he continues to suffer from medical issues, receives speech therapy twice a week, and displays behavioral issues including frequent temper tantrums. In light of the children's extensive needs and respondent-mother's failure to assure the trial court that she would have access to transportation in the future, respondent-mother's arguments that "the missed medical appointments [related to James's birth defect] that caused concern when the children were [placed into DHHS] custody . . . [are] no longer an issue[,]" and that, "[a]s to the other appointments, it is not as if each child has all those appointments[,]" do not strike us as persuasive.

Respondent-mother also argues that the trial court's findings expressing concern about her (1) "ability to ensure that the juveniles attend scheduled appointments despite her claims that she now has the ability to schedule and manage appointments with a calendar reminder system" and her (2) "ability to transport the minor children to their medical and school appointments" "[g]iven [her] significant issues with transportation," lack sufficient evidentiary support and do not tend to show a likelihood of future neglect. The trial court's findings relating to this issue focus upon a visit that respondent-mother missed with the children on 21 May 2019. According to the trial court, respondent-mother failed to call to confirm the visit, took

vacation time to go to a different city to look for a new car, and missed the scheduled visit because it "slipped her mind[.]" In the trial court's view, the missed visit created a legitimate concern about respondent-mother's ability to schedule and manage the children's appointments.

At the termination hearing, respondent-mother testified that, if the children were returned to her care, she would keep up with their medications and medical and school appointments using a calendar that she would link to her phone so that she would be alerted to the needs of the children. However, upon being asked about why she could not get to her weekly supervised visits with the children, respondent-mother claimed that the underlying missed visit stemmed from a problem in making the required day-ahead confirmation call. Although a confirmation call was required prior to each visit, respondent-mother testified that she simply forgets to make it. Upon being asked if it had occurred to her to adopt the calendar and reminder-based system that she had described in the testimony at the termination hearing, respondent-mother stated, even though she had reminders on her phone, "sometimes my phone—it just—it don't go off for the call thing." In our view, this evidence supports the trial court's expression of concern about respondent-mother's ability to schedule and manage the children's medical and school appointments, with the existence of such difficulties clearly tending to show that there is a risk that future neglect will occur if respondent-mother becomes responsible for the children's care.

After finding that respondent-mother had transportation-related difficulties and that these problems had impaired her ability to get to her scheduled visits with the children, the trial court noted that, "despite her transportation difficulties, [respondent-mother] has never missed a day of work or been late to work." In addition, a social worker testified that she expected that the children would see providers in the community in which respondent-mother lived, rather than in Greensboro, in the event that they were returned to respondent-mother's care and that public transportation would be available for respondent-mother's use. In light of the trial court's findings that she had never missed work and the social worker's testimony that the children would likely see local providers, respondent-mother argues that the trial court's expression of concern about the impact of her transportation-related difficulties on the children lacked sufficient record support and did not support a determination that the children were likely to be neglected in the future.

Aside from the fact that there was no guarantee that the children's appointments would be transferred to her local community or that public transportation would be adequate to serve respondent-mother's needs, the simple facts of the matter remain, as the trial court's evidentiary findings reflect, that respondent-mother had transportation difficulties, that the children had complicated schedules, and that respondent-mother had missed visiting with the children due to her own inattention. As a result, the trial court had legitimate grounds for being

concerned about respondent-mother's ability to get the children to their numerous medical and school-related appointments even though the record contained evidence that would have supported a contrary inference, *see In re B.O.A.*, 372 N.C. at 379, 831 S.E.2d at 310 (stating that "[a] trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding"), and did not err by considering these difficulties in determining whether there was a probability that the children would be neglected if they were returned to respondent-mother's care.

Finally, the trial court found that respondent-mother worked from "7:00 p.m. to 7:00 a.m.[,]" that "her plan of care would include family and friends," and that "she has failed to provide sufficient information to [DHHS] or the [c]ourt so that an evaluation can be made as to the ability of these individuals to meet the needs of the children." Although we note that respondent-mother has not challenged the sufficiency of the record support for these findings, so that they are binding for purposes of appellate review, *In re Z.V.A.*, 373 N.C. at 211, 835 S.E.2d at 429, we note that many people with similar work schedules are able to provide more than adequate care for their children and do not believe that respondent-mother's work schedule, standing alone, has any bearing upon the extent to which the neglect that the children had previously experienced is likely to be repeated if they are returned to respondent-mother's care.

After reviewing the relevant portions of the record, we hold that the trial court's finding that "[respondent-mother] has made substantial progress in activities on her case plan" has ample record support. On the other hand, the same is true of the trial court's determination that, despite the commendable progress that respondent-mother had made in complying with the provisions of her case plan, "she lacks substantial capacity to meet the needs of the children, has inadequate plans for the future[,] and has not demonstrated an ability to plan for obstacles." Simply put, the record supports the trial court's determinations that respondent-mother has failed to acquire appropriate housing that is sufficient to safely accommodate the children's special needs and behavioral issues; that respondent-mother continues to react inappropriately in stressful situations; that respondent-mother has failed to consistently visit with the children as a result of her inability to remember to confirm visits and her transportation-related problems; that there were reasons for concern about respondent-mother's ability to manage the children's complex schedules and appointments; and that respondent-mother had not provided a sufficient plan of care for the children.

## 2. Likelihood of Repetition of Neglect

Secondly, we must determine whether the trial court's findings of fact support its conclusion that there is a likelihood that the neglect that the children had previously experienced would be repeated if they were returned to her care. *See In re J.O.D.*, 374 N.C. at 807, 844 S.E.2d at 578 (noting that a determination that there

is a likelihood of repeated neglect is a conclusion of law, regardless of the manner in which it is labeled). According to respondent-mother, the trial court should have answered this question in the negative given that she had made substantial progress in satisfying the requirements of her case plan and given that the nature and the extent in the changes that she had made by the time of the termination hearing provided no support for a determination that future neglect was probable. We disagree.

As this Court has previously noted, a parent's compliance with his or her case plan does not preclude a finding of neglect. *See In re D.W.P.*, 373 N.C. 327, 339–40, 838 S.E.2d 396, 406 (2020) (noting the respondent's progress in satisfying the requirements of her case plan while upholding the trial court's determination that there was a likelihood that the neglect would be repeated in the future because the respondent had failed "to recognize and break patterns of abuse that put her children at risk"). Although respondent-mother had substantially complied with most of the requirements of her case plan, many of the concerns that resulted in the children's placement in DHHS custody continue to exist.

As we have previously noted, the trial court's findings establish that respondent-mother's housing, while stable, could not safely accommodate the children given their special needs and behavioral issues, including Joshua's inappropriate sexual behavior; that respondent-mother had failed to locate appropriate housing despite the fact that DHHS had raised concerns about the

adequacy of her current residence as early as February 2018; that respondent-mother continued to display inappropriate responses in stressful situations despite the fact that she had completed anger management classes; that respondent-mother had missed at least twenty-two scheduled visits with the children; that there were legitimate concerns about respondent-mother's ability to manage the children's complicated schedules and to get the children to their various medical and therapeutic appointments; and that respondent-mother did not have an adequate plan for dealing with her work-related commitments and transportation-related difficulties. As a result, after carefully reviewing the record, we have no difficulty in concluding that the trial court's findings provide more than ample support for a determination that the children would likely be neglected in the event that they were returned to respondent-mother's care. In fact, the making of a contrary determination would require us to conclude that, in spite of the fact that respondent-mother has a limited ability to deal with frustrating situations, faces financial and housing-related difficulties, has trouble keeping track of her obligations (such as the children's numerous appointments), and has limited access to transportation-related resources, respondent-mother will be able to provide minimally acceptable care for five children, one of whom has significant emotional problems and all of whom have special needs, by providing them with adequate housing; managing their emotional, medical, and interpersonal difficulties; and getting them to their appointments without a repetition of the neglect which they had previously experienced. All in all,

we conclude that the combination of respondent-mother's weaknesses coupled with the challenges created by the children's conditions provides compelling justification for a determination that a decision to return the children to respondent-mother's care would almost certainly end in future neglect and that respondent-mother had been provided more than sufficient time to overcome the obstacles that she faced in attempting to provide adequate care for the children. As a result, we hold that the trial court did not err by determining that a repetition of neglect is likely if the children are returned to respondent-mother's care and affirm the trial court's determination that respondent-mother's parental rights in the children were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

## B. Dispositional Determination

In addition, respondent-mother contends that the trial court erred by determining that it was in the children's best interests that her parental rights be terminated. At the dispositional stage of a termination of parental rights proceeding, the trial court is required to "determine whether terminating the parent's rights is in the juvenile's best interests" based upon a consideration of the following factors:

(1)     The age of the juvenile.

(2)     The likelihood of adoption of the juvenile.

(3)     Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

(4)     The bond between the juvenile and the parent.

> (5)    The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6)    Any relevant consideration.

N.C.G.S. § 7B-1110(a). We review the trial court's determination concerning whether the termination of a parent's parental rights in a child would be in that child's best interests for an abuse of discretion. *See In re Z.A.M.*, 374 N.C. 88, 99–100, 839 S.E.2d 792, 800 (2020). "Under this standard, we defer to the trial court's decision unless it is 'manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision.'" *Id.* at 100, 839 S.E.2d at 800 (quoting *Briley v. Farabow*, 348 N.C. 537, 547, 501 S.E.2d 649, 656 (1998)).

In this case, the trial court made the dispositional findings required by N.C.G.S. § 7B-1110(a) by addressing the children's ages, the likelihood that each child would be adopted, and the quality of the relationship between the children and the proposed adoptive parents, to the extent that any such person or persons had been identified. With respect to the children who did not yet have prospective adoptive parents, the trial court made findings addressing the relationship between the children and their foster parents.[6] The trial court found that all of the children were bonded with their current placements and that each of them had adapted to their current placements well. After finding that each of the children had a bond with

---

[6] James, Kim, and Jake had been placed in pre-adoptive placements while Stacy and Joshua had not.

respondent-mother, the trial court further found that Joshua's relationship with respondent-mother was more reserved. Moreover, the trial court found that termination of parental rights would assist in the effectuation of the children's primary permanent plans of adoption by freeing them for the adoptive process. Finally, the trial court found that, while the children were bonded with one another, the extent to which the children would be able to retain their existing connection in the event that they were adopted was outside DHHS's control.

Although respondent-mother has not challenged the sufficiency of the evidentiary support for the trial court's dispositional findings, she does argue that "[t]he potential effect of having or not having any one or more of the siblings in the household is a relevant consideration and [that] the trial court erred in failing to address this." In essence, respondent-mother asserts that the best interests of each child hinges upon the best interests of the other children and contends that the trial court should have made findings concerning the manner in which the best interests of each child would be affected by a decision to terminate her parental rights in certain of the other children, but not all of them. We disagree.

At the dispositional stage of a termination of parental rights proceeding, the trial court must determine the best interests of each child based upon his or her individual circumstances. N.C.G.S. § 7B-1110(a); *see also In re Montgomery*, 311 N.C. at 109, 316 S.E.2d at 251 (stating that "the fundamental principle underlying North Carolina's approach to controversies involving child . . . custody [is] that the best

interest of the child is the polar star"). In view of the fact that the trial court made the required dispositional findings with respect to each child and weighed the findings applicable to each child in making its dispositional decision, we are unable to conclude that the trial court's findings are insufficient to support its dispositional decision.

In addition, respondent-mother argues that the termination of her parental rights was not in the best interests of the children given that each of them was bonded with her and each of the other children and that not all of the children were living in pre-adoptive placements. However, the trial court's findings demonstrate that it considered the children's bonds with each other and with respondent-mother and the fact that all of the children did not have pre-adoptive placements. Although each of the factors upon which respondent-mother's argument relies were appropriately considered in the trial court's dispositional analysis, none of them is entitled to dispositive effect. *See In re A.J.T.*, 374 N.C. 504, 512, 843 S.E.2d 192, 197 (2020) (stating that "[t]he absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar to terminating parental rights") (citing *In re A.R.A.*, 373 N.C. at 200, 835 S.E.2d at 424); *In re Z.A.M.*, 374 N.C. at 100, 839 S.E.2d at 800 (weighing the children's bonds along with the other "best interest" factors). After carefully reviewing the record, we are satisfied that the trial court's findings demonstrate that it conducted an appropriate and reasoned "best interests" analysis relating to each child. As a result, we hold that the trial court did not abuse its

discretion by concluding that the termination of respondent-mother's parental rights would be in the children's best interests.

### III. Conclusion

Thus, for the reasons set forth above, we hold that the trial court did not err by determining that respondent-mother's parental rights in the children were subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1) and that termination of respondent-mother's parental rights in the children would be in the children's best interests. As a result, the trial court's termination order is affirmed.

AFFIRMED.

Justice EARLS, dissenting.

The majority affirms the trial court's order terminating respondent-mother's parental rights in the minor children, agreeing with the trial court that "while [respondent-mother] made substantial progress in activities on her case plan, and while she dearly loves her children, she lacks substantial capacity to meet the needs of the children, had inadequate plans for the future and has not demonstrated an ability to plan for obstacles." While these children have not been in their mother's care for a long time, nevertheless I would hold that the trial court's findings ultimately do not provide clear, cogent, and convincing support for the trial court's conclusion that respondent-mother is unable to meet the needs of the children, has inadequate plans for the future, and has not demonstrated the ability to plan for obstacles. Further, I am concerned that in minimizing the importance of the substantial progress respondent-mother made on her case plan to the analysis of whether a ground existed to terminate parental rights, the majority devalues the efforts of parents across our State working to improve their parenting capacities and regain custody of their children by meeting the requirements imposed by local agencies.

The facts the majority cobbles together to support the trial court's order terminating respondent-mother's parental rights on the grounds of neglect are not overwhelming. Moreover, they illustrate the danger that this parent is losing her children primarily because of her poverty, despite the fact she is employed full-time.

It is hard to imagine what she could possibly do differently at this time, before she has custody of her children or even a reasonable expectation that they will be returned to her custody imminently, to satisfy the requirements of a larger home and better transportation. Her ability to plan for obstacles is surely affected by her finances. Earning a low income while working in a full-time job is not itself evidence that there is a likelihood of future neglect.

## Employment/Income

The trial court found that respondent-mother's budget reflected "a monthly surplus of $471.80, an income in excess of her expenses that would potentially be applied to additional expenses if the juveniles were to come live with her, and her current employment provides an even greater income." The trial court found the budget surplus could be applied to medical expenses and/or potential childcare and school costs that she would incur if the children were to live with her, and it further found that while "[h]er rent and other expenses have stayed the same[,]" "her current employment provides an even greater income." Based on its evidentiary findings, the trial court found "[respondent-mother] has seen a substantial increase in her earning capacity[,]" and, "[a]t this time, [she] has sufficient income to provide for herself and the juveniles."

According to the majority, the fact that respondent-mother obtained steady employment that allowed her to earn sufficient financial resources to provide for her children is not enough to address the concerns regarding this aspect of her case plan

because "the trial court found that respondent-mother's budgeting skills contained certain deficiencies." In the majority's view, respondent-mother's failure to account for her children's expenses in a budget that appears to have accurately accounted for her expenses at the time it was created in December 2017—more than a year after the children were taken out of her custody by DHHS—is sufficient evidence to support the conclusion that respondent-mother "ha[d] not proven the ability to care for herself and the children financially despite her employment." But in concluding that the trial court's findings "reflect, without directly stating, a nuanced determination that, while respondent-mother's financial situation had improved in light of her ability to obtain higher-paying employment and even though she appeared to have sufficient financial resources in light of current conditions, the trial court continued to harbor reservations about respondent-mother's ability to satisfy her own financial needs and those of all five children," the majority reads into the trial court order a factual finding that simply is not there. And by identifying the respondent-mother's "deficient" budgeting skills as evidence which supports the trial court's supposed factual finding, the majority places inordinate weight on an incident of unclear significance which bears extremely limited probative value. In contrast to the majority, I would disregard the challenged portion of finding of fact twenty-nine concerning respondent-mother's inability to provide for herself and the children financially. *See In re J.M.*, 373 N.C. 352, 358, 838 S.E.2d 173, 177 (2020).

## **Housing**

The trial court found in finding of fact eighteen that respondent-mother "went to substantial effort to obtain independent housing" and "obtained her own housing in Thomasville, North Carolina." She notified DHHS when she obtained housing, provided DHHS a copy of her lease dated 12 September 2017, and DHHS had completed home visits. Her home was a two-bedroom house and was fully furnished. Respondent-mother initially planned for the children to sleep in one bedroom with two sets of twin bunk beds and single twin beds and a partition to separate the boys and girls. However, she revised her plan to allow Joshua to have his own bedroom after DHHS informed her in February 2018 that the initial arrangement was inappropriate due to Joshua's sexualized behaviors. Nevertheless, the trial court found that "even a revised living plan within the current residence will not provide for sufficient space and opportunities for the juveniles" given "the variety of challenges that the various juveniles face," including attention deficit/hyperactivity disorder, oppositional defiant disorder, behavioral problems, and academic struggles. The trial court additionally found that respondent-mother was taking steps to find more appropriate housing but had yet to find suitable housing within her budget, noting that "subsidized housing programs would not approve her for a residence that would be scaled based on all the juveniles, unless or until they had a date as to when the juveniles will be living with her." Lastly, the trial court found that respondent-mother "has three large dogs at the home"; "911 logs contained several calls to the

home in reference to the dogs"; and a social worker was unable to approach the porch during an unannounced home visit in June 2019 because "there was a very large dog barking viciously."

It is clear from testimony at the termination hearing that there were no concerns regarding the cleanliness or maintenance of respondent's home, and no concerns are reflected in the trial court's findings or in the record. The testimony was that DHHS's concerns related solely to the size of the home given the number of children, their challenges and needs, and the presence of the dogs. As the majority acknowledges, "respondent-mother faces a dilemma arising from the fact that she cannot obtain additional housing assistance until a date upon which the children will begin living with her has been established and that she cannot obtain adequate housing in the absence of this increased amount of public housing assistance." I disagree with the majority's conclusion that this "dilemma" is irrelevant in assessing the evidentiary record because respondent-mother "has apparently not been able to even locate a residence that she could obtain in the event that additional housing assistance became available to her." It appears that the sole barrier to obtaining suitable housing is respondent-mother's inability to access an expanded housing subsidy. Her maintenance and upkeep of her current apartment indicates that there is no cause to doubt that she will be able to provide a safe and appropriate home for the children if she obtained custody. There is no independent evidence in the record supporting the inference the majority draws that even if she obtained an expanded

housing subsidy, she would be unable to obtain suitable housing. Thus, I would conclude that respondent-mother is correct that the evidence in the record does not support the trial court's conclusion that her housing situation at the time of the termination hearing demonstrated a likelihood of repetition of neglect.[1]

Respondent-mother also challenges the findings related to the dogs. She contends the evidence does not support the findings that she owned "three large dogs" or that there were "several" 911 calls regarding the dogs. I agree there was not clear, cogent, and convincing evidence to support the challenged findings. While prior records in the case indicated respondent-mother owned three large dogs, a social worker testified at the termination hearing that she only saw two dogs during her unannounced home visit, and respondent-mother testified that she owned two dogs, a "little Jack Russell" and an "American Bully." Additionally, the evidence concerning 911 calls related to the dogs did not indicate the number of calls or the reasons for the calls; the testimony was simply that there were 911 calls regarding the dogs.

---

[1] The majority argues that *In re A.G.M.* is inapposite because in the present case, there was evidence that respondent-mother "intended to bring the children to live with her in her existing residence." However, *In re A.G.M.* stands for the proposition that a parent's current lack of appropriate housing is not evidence of future neglect if the respondent-parent is willing and able to cure any deficiencies prior to having "any legitimate expectation that she would obtain . . . custody of the children." *In re A.G.M.*, 241 N.C. App. at 442, 773 S.E.2d at 134. In the present case, the mere fact that respondent-mother at one point contemplated that the children might live in her home does not negate the fact that if she were to gain custody of her children, she would be able to use her additional housing assistance to obtain more suitable housing.

Accordingly, I would disregard the challenged portions of the findings related to the dogs.

## Substance Abuse

The majority concluded that "the trial court's evidentiary findings do not support a determination that she refused to participate in the drug screening process for a 'long period of time' or show that her temporary refusal to participate in the drug screening process had 'impeded the monitoring of compliance.' " Although I agree with the majority that "the fact that respondent-mother subsequently complied with requests that she submit to drug screening does not negate the fact that she expressed frustrations about the drug screening process in June, July, and August 2017," I would also recognize that the respondent-mother's eventual acknowledgment of the importance of the drug screening requirement and her subsequent compliance is the kind of "considerable change in conditions [that] had occurred by the time of the termination proceeding" which must be examined in reaching an ultimate conclusion as to whether a ground exists for terminating her parental rights. *In re Young*, 346 N.C. 244, 250, 485 S.E.2d 612, 616 (1997). After accounting for these changes, I do not see how her brief period of missed drug screenings in 2017 supports terminating respondent's parental rights today.

## Mental Health

Respondent-mother correctly contends that although there was evidence indicating she was resistant to therapy at times, there was also evidence that she

sought additional services on her own when DHHS expressed concern that she was no longer engaging in therapy. A social worker testified that respondent-mother sought therapy in Davidson County, but that there was a waitlist for services. Despite some evidence of resistance, the trial court failed to issue any evidentiary findings to support its determination that ongoing neglect was evidenced by respondent-mother's resistance to psychological services. The evidentiary findings made by the trial court show respondent-mother engaged in recommended mental health services, as well as recommended substance abuse, parenting, domestic violence, and anger management courses. In contrast to the majority, I would disregard the portion of finding of fact twenty-nine regarding resistance to utilizing psychological services.

### Visitation/Child Support/Other

The majority's analysis with regard to these aspects of respondent-mother's case plan fails to address the trial court's finding that respondent-mother "redirects [the children] as needed" during visits and does not adequately credit the clear finding that she "has learned additional tools for discipline, in that if the juveniles were to return home, she would tailor appropriate discipline to the specific needs of each juvenile." Given this finding, the trial court's other findings relating to respondent-mother's previous statements evincing a belief in inappropriate forms of discipline should be treated as past conditions that are no longer present and thus not relevant to the determination of whether she is likely to neglect the children in the future by inappropriately disciplining them. I agree with the majority that the

lack of detail at this stage concerning how respondent-mother's work and family obligations could be met is an obstacle to reunification, but that obstacle, by itself, is too slim a reed upon which to base an ultimate finding of a likelihood of future neglect.

## Conclusion

Respondent-mother argues the trial court erred by concluding there was a likelihood of repetition of neglect because she had made substantial progress on her case plan and the changed conditions existing at the time of the termination hearing do not support the conclusion that there was a likelihood of repetition of neglect. She summarizes her case plan progress, including her gainful employment; stable housing; completion of programs to address substance abuse, parenting skills, domestic violence, and anger management and to understand Joshua's behavior issues; and general betterment of herself as compared to when the children were placed in DHHS custody.

It is true that case-plan compliance does not preclude a conclusion that a repetition of neglect is likely. *See In re D.W.P.*, 373 N.C. 327, 339–40, 838 S.E.2d 396, 406 (2020). It is also true that although respondent-mother substantially complied with the requirements of her case plan, some issues and concerns that brought the children into DHHS custody remained. However, the fact that there is evidence suggesting that there may be ongoing concerns regarding respondent-mother's circumstances is not equivalent to evidence that she is likely to neglect her children in the future, which must be judged against the enumerated standards for neglect

defined by our Juvenile Code. N.C.G.S. § 7B-101(15). Further, while respondent-mother's substantial progress on her case plan does not preclude the court from finding that there is a likelihood of future neglect, evidence that she has made "progress on her case plan [ ] to become a better parent" does signify that she has taken steps "to reduce or remove the likelihood of future neglect." *In re C.N.*, 266 N.C. App. 463, 469, 831 S.E.2d 878, 883 (2019). As this Court has previously held, a trial court "may appropriately conclude that [a] child is neglected" only when "a parent has failed or is unable to adequately provide for his [or her] child's physical and economic needs, . . . and it appears that the parent will not or is not able to correct those inadequate conditions within a reasonable time." *In re Montgomery*, 311 N.C. at 109, 316 S.E.2d at 252. In the present case, while there is evidence to support a conclusion that there are conditions in respondent-mother's life that might make it difficult for her to attend to her children's needs, there is not clear, cogent, and convincing evidence that these conditions make it *likely* that she will provide *inadequate* care.

With regards to at least some of the relevant conditions, such as her present lack of suitable housing or her ability to provide financially for her children, the evidence indicates that she will be able to correct those inadequate conditions within a reasonable time. Although there may be a possibility that respondent-mother will face difficulties in adequately caring for her children, a mere possibility of future neglect is an insufficient basis upon which to permanently sever the parent-child

bond. *Cf. In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698 (2019) (when making "predictive" judgments about the future, "the trial court must assess whether there is a *substantial risk* of future . . . neglect of a child") (emphasis added); *In re F.S.*, 268 N.C. App. 34, 43, 835 S.E.2d 465, 471 (2019) ("[T]he trial court must assess and find the probability that there is substantial risk of future neglect."). In the present case, the evidence simply does not support the conclusion that respondent-mother is likely to neglect her children in the future, nor does it support the conclusion the dissent reaches that "a decision to return the children to her care would almost certainly be doomed to failure." Accordingly, I dissent from the majority's decision to affirm trial court's adjudication of neglect pursuant to N.C.G.S. § 7B-1111(a)(1) as grounds to terminate respondent-mother's parental rights, and I would not reach the question of whether termination was in the best interests of the children.